We'll hear argument next today in Case 12-7822, Fernandez v. California. Mr. Fisher. Mr. Chief Justice, and may it please the Court, the doctrine of third-party consent is best understood as establishing a rebuttable presumption. When the police arrive at a house at which multiple people live, they can assume, according to social custom, that if one person grants consent to enter, that person is speaking for everybody who lives in the dwelling. But when somebody is present and tells the police officer that he refuses consent, that presumption is reversed. Then, when the police full well know that one person doesn't have the delegated authority to speak for the others, they must respect the objection, and a failure to do so violates the Fourth Amendment. In other words, Matlock already gives the police all of the benefit of the doubt. Even when people are nearby and have a — might have an interest in objecting, the police can assume, as this put — as this Court put it in Randolph, that asking that other person wouldn't make a difference very often, and therefore, they can presume that they would also consent to the search. So all were — Breyer, maybe I should put to you at the outset the problem, the case that's bothering me. Neighbors hear a noise. Police come to the door. Man and wife are there. She, as in this case, has a bump on her nose, holding a baby, and is crying and blood on her shirt. The police, for whatever set of reasons, arrest the husband. The woman says, Mr. Policeman, I would like you to come in the house. I'd like you to look at a couple of the closets. I'm worried about what's in them. I can't quite tell you what it is. I don't know. But I'd like you to look through the house. Now, is that woman never to be able to get a policeman in the house? Never? I mean, months go by? Is she owns the house, too? And by the way, I've tried to keep out of my hypothetical any other basis for getting in. It's not a — she's not a danger. The husband's gone. She is no destruction of evidence. She won't destroy it. You see? And so that is — she owns the house. Can she never invite the policeman in? She can invite them in, Justice Breyer, and the police, within about 15 minutes, can get a warrant and come right in and get the baby. On what basis? Pardon me?  On the basis that I think that you've just described that she said there's no danger. No. She says, I don't know what's in the closet, Mr. Policeman. I don't know that it has anything to do with my bloody nose. I just would like you to take a look around. Now, see, I tried to keep out probable cause. I've tried to eliminate any other basis. And that's what is worrying me on worry stemming from, but it's her house, too? Can't she invite people into her house, too, whom she wants, including the policeman? Now, that's the example that got me to write separately in the other case. That's the example that keeps gnawing on my mind. And I'd like you to address it. Well, Justice Breyer, I've never seen a case like that, but there would be two things I would say if one arose. One is, under the Coolidge case, she could simply go get the things in the closet and give it to the police officer. And that would take care of the problem, as Justice Thomas pointed out in his separate opinion in Randolph. In addition, she may well be able to invite the police into the dwelling sometimes, but that's very different than what's going on here. And I think that's the problem. How could she invite them in? The husband has said, never. I don't want a policeman to set foot in my house. And it's not just the closet. She wants the police to take a good look around. Well, no, I'm sorry. Then I misunderstood. In that case, it would violate the Fourth Amendment for the police to come in. But I think the hypotheticals that one might think of and that can arise, and certainly what the other side has pointed out in the brief, leave out three very important things that I think you need to ask under the Fourth Amendment's social customs analysis. The first is, you need to remember that we're asking about whether a stranger — because the police officer can step into the shoes of what a stranger would be allowed to do — whether a stranger would feel like that was acceptable reason to come into the house, not just because they've been invited by the wife, but vis-à-vis what the objector had said. And it's very different when you ask about a stranger as opposed to what the other side would like to say, a neighbor or — Well, I have — Mr. Fisher, I have — I wasn't here for Randolph. I have trouble getting my mind around this entire problem. I would never think of telling my co-tenant that she could not invite her friends or other people into the house. And so I don't understand why the fact that one is a joint tenant is not the end of the analysis. Why shouldn't it be? Fisher, because I think that was just the point I was trying to make, Justice Alito. A friend is different than a police officer. Remember what the objection said in this case. It said you can't come in, and he said, I know my rights. And so translated, as best we can translate that kind of a statement to the social setting that we're supposed to translate it to, it's saying — Kennedy, you said that there is a forensic professor at the law school. I think it's still very — And she says, I'm concerned there might be evidence of a crime here. I don't want any part of it. I want you to give me your expert opinion on that. I think it's very different. I don't know why you want us to write an opinion saying that the police are different from anybody else. There's just no authority for that. No, I think the police can stand into the shoes, as this Court put it in Hardeen's, Justice Kennedy, of a stranger. They're not a friend. They're able to do what a stranger caller could do at the house. And that's a very different question than what a friend might do. And there's two other things that I think are critical. Why is it a different question? If I own premises, I can invite in a friend, I can invite in a relative, I can invite in a complete stranger if I want to do that. That's the ordinary presumption. But what this Court held in— Sotomayor, it's not a presumption. It's a right. Is it not? It may be a property right, but it's trumped by the constitutional right of another resident of the dwelling to forbid the police for entering without a warrant. That's the holding in Randolph. And I understand— I understand that. Why should— There was a debate on that. Well, all right. Why should I feel myself bound by that? Well, because it's this Court's precedent and none of the one on the other side is asking to have it overturned. Well, if I could— Scalia, you're asking to extend it. One doesn't have to overrule it to say we're not going to follow it to its logical conclusion. Well, I think, Justice Scalia, that's a fair way to put the question here, which is once somebody does exactly what this Court said they had a right to do in Randolph, which is say, you cannot come in my house, what happens next? And our proposal in this case is that the police cannot nullify that objection simply by involuntarily removing the person from the premises. Randolph, I forget exactly how many times, but repeatedly said it was discussing a case involving the physical presence. And it had to do that because it was drawing a very formalistic line. If the other person had been in the back room instead of at the door or if the other person had been away for a minute, Randolph, by its terms, would not apply because it said physical presence. So it's not even extending Randolph to its logical conclusions. It specifically said we are not reaching anything beyond physical presence. Well, I think, Mr. Chief Justice, if I could fairly characterize the case, there is physical presence in this case. Mr. Randolph, I'm sorry, Mr. Fernandez was physically present and enforced and invoked his Randolph rights. So the question is, what happens next? And my only supposition is that this Court is not going to do that. Kennedy, what happens next for 10 hours, 10 days? He was in custody for 500-plus days, and for all that time the co-tenant, the wife, cannot invite the police to look for a shotgun where the 4-year-old knows that it is and she may not know how to hand the weapon? She can't get a policeman to assist her for 500 days? This is not Randolph. This is a vast extension of Randolph. Well, two things, Justice Kennedy. All we are saying is that the objection for Randolph has to last as long as the police make it impossible for somebody to enforce it. So once they remove you and make it impossible for you even to camp on your doorstep, which is what the other side would require, at a bare minimum, if Randolph means anything, it has to mean that. And to answer your hypothetical directly, the police can simply get a warrant. If you look at the lower court cases, they all arise immediately after an arrest, which is why. Kennedy, Justice Breyer's question was very carefully phrased to indicate, at least to me, that there was no probable cause. You're asking the property owner to invoke a legal form that is itself highly invasive. She doesn't want a warrant. She wants the police to come in for advice. If she wants that, she has numerous ways to help the police, Justice Kennedy. It's hard for me to think of many examples, just to be fair, where by providing oral information about what she might be worried about, what she might think is in the house, in combination with the fact that the defendant has already been arrested, that would not provide probable cause. As I've said, I have not seen such a case that has ever actually arisen. Alito, you can say that in lots of consent search cases. I don't think that answers the question of whether the person has validly consented. Is there a rule that says you can't have a consent search where there's probable cause, because where there's probable cause, you can get a warrant, and therefore you can't consent to the search? Is there a case that says that? No, of course not. Well, so why should that be the rule here? No, I'm simply answering the practical question. I think what I'm trying to do is answer the practical question that Justice Breyer and Justice Kennedy have raised about what if the police can't come in under the really fallacious theory that she's consenting not only out of the house. You have a woman who's been beaten up. She's got bruises. She's standing on the doorstep of her house, and she says to the police, I'd like you to come into the house and see evidence of what my husband has been doing to me. And you're you're you say she can't do that. She has it's her house, but she can't invite the police in. Remember, there are two people that have rights in that scenario, her and the defendant or the suspect. And what the Constitution says is that searches of homes presumably have to be done under warrant. Now, if somebody consents and the police have no reason to doubt that that consent speaks not only for the person standing in front of them, but also for an absent person, they can enter. And that's what happens most of the time. But in the rare occasion where somebody says, I invoke my rights, I want to insist upon the warrant requirement, the police ought to do that. I don't think it's too much to ask. Roberts. What about what we said in King just last year or the year before? It's a quote. That seems to me to entirely refute the idea that, oh, well, what they should do is get a warrant. No. Mr. Chief Justice, the police can do that, and presumably no matter what you hold in this case, they will continue to do that.  I don't think that's the answer to this question, you see, because once you say right, you assume the answer. I mean, if the wife has, to the extent she has the ability to ask anyone, anybody  the police ought to do that. But if the wife has the ability to ask anyone, anybody, to get into the house, even over the husband's objection, then the conclusion is he doesn't have a privacy right or a reasonable expectation of privacy vis-a-vis what his wife wants. And if you decide it the other way, he does. And the hard problem, I mean, the hard problem for me is, is under, but I'll ask the other side that. Under what circumstances, when, how do we work out? And the answer in Randolph was social expectation, and, frankly, I don't know what the social expectation is. Fisherman, Well, let me try to walk you through it, because I think it is vital here. The answer to your question, Justice Breyer, is the holding of Randolph says when the other tenant objects, then the police cannot come in. And so I think the question that you need to ask in this case for social expectations purposes, and it's critical that it's framed the right way, and I do want to point out the three things I was mentioning earlier. You have to ask whether a stranger under these circumstances would feel like he had consent, not just from the person standing in front of him, but on behalf of the others, to conduct a general search of the dwelling. Even if you think that somebody coming back would think they could be invited in because the objector is no longer gone, that is leagues away from what the police asked to do here and what they're contending they had the right to do, which is conduct a general search of the premises. And on page 7 of the reply brief, we point out again and again how this Court has distinguished between mere entry and search. And the third thing, if I could just put it on the table and then I'll answer your question. The third thing that's critical is what I mentioned a moment earlier, the nature of the objection here. The nature of the objection isn't simply you can't come in. It isn't I'm busy, you can come back later. It is I know my rights. And I think translated into a social setting with a stranger, that means I have private things in here that I do not want you to see. And would somebody coming back an hour later think that over that kind of an objection they could get consent from the other person to search through the belongings? I think that's the question you have to ask. Sotomayor What do you make of the language in Randolph about pretext? Fisher About pretext? Sotomayor Yes. Does it help you in any way? Fisher In all fairness, I don't know that it does. It certainly doesn't help me on the facts of this case because we're not establishing any bad or we're not alleging any bad faith. I think the government and the State have both pointed out quite rightly that this Court has shunned pretext inquiries throughout the Fourth Amendment. And so I'm not sure that you'd want to go down that road here, but, Justice Sotomayor, that points out a very big problem. Their rule is a recipe for the evisceration of Randolph. Sotomayor Sure. Fisher Because as soon as Sotomayor Because all they have to do is arrest and remove people. Fisher All you have to do is arrest and remove them, and that's the facts of this case. But even if you didn't have the authority to arrest and remove them, the police always have the authority to exert control over the situation when they arrive at a dwelling and to say to a homeowner, sir, would you please come out to the curb and talk to me here, and I'm going to separate you from the other tenant. Under their theory, even that ordinary, boring part of police procedure extinguishes somebody's Randolph rights immediately. And so their rule simply gives the police total control, whether for good faith or for bad faith, and I don't think you're going to want to have to try to answer that question, to immediately extinguish someone's Randolph's rights the moment they're invoked. Ginsburg Mr. Fisher, and we can stick with this case. Once he's arrested on a robbery charge, he can be held for many, many days. Why isn't it appropriate to assume, not when he's asked to come out and talk to the police for two minutes, but when he's incarcerated on a robbery charge, that the premises are no longer open to him, that he is no longer at home there? Fisher I think I'd agree with what you're saying, Justice Ginsburg. If somebody's convicted of a crime and then imprisoned, I think they lose their equal ownership over the dwelling. Ginsburg In the interim, he's been charged, not convicted, and he's in jail awaiting trial. Fisher I'm not sure that a charge would be enough to take one out of the social setting where one would assume that somebody's objections still stood. Kennedy He was in jail for 500-plus days. And you're saying that for all that time, the co-occupant has no complete control over the premises. Fisher Justice Kennedy, at least until he's convicted, I don't think he does. Now, you don't have to go to the court. If that really is what's troubling you, let me tell you something that I think you can decide the case on a more narrow ground. It's enough to decide this case, and indeed the vast majority of lower court cases, to say, so long as the police make it impossible for somebody to enforce the Randolph objection, either by being at their home to protect it on their own, or at least to have a conversation with the co-tenant to try to work it out amongst themselves, which is, remember, exactly what Randolph says, is that voluntary accommodation has to be the solution. So at least within, you know, at least in a case like this where there's an hour and somebody's gone, the police return right away, it is virtually impossible. I think there the objection has to stand. After 500 days, if you really wanted to at least leave it open for another case, you could say there we could imagine that he could have a conversation with the co-tenant, try to work out the solution to the problem, and that she could speak for him solely to the police in that case. Roberts What's the conversation between the husband and the battered wife bleeding, holding the 4-year-old baby going to look like? Presumably it has to take place away from the police because it's, you know, it's a private conversation. So the spouse abuser says to the police, just give me a few minutes, let me talk to my wife, and that conversation is going to lead to some accommodation that you'd be prepared to honor? Fisher Well, I think, Mr. Chief Justice, in that situation, the police would probably do well to do exactly what they did here, which is remove him from the premises, arrest him, and then all they, again, have to do is get a warrant. In Los Angeles County, it takes them 15 minutes on average to get a telephonic warrant. And under Killen law you can't do that. Roberts I quoted you the language from King from last year where we said that's not an adequate answer. Fisher Well, I think, to be fair, in this Court's cases they've – sometimes you've said, and we've quoted those other cases in the reply brief, that administrative efficiency is not a good enough reason to dispense with the warrant requirement. I think every one of these cases is context-specific. And the one thing that the Fourth Amendment has, I think, meant in this Court is that the home is special, and that when the police want to enter a home, Floyd v. Hardeen's last term, I think, also fairly said that we prefer warrants. I think Hardeen's is actually a very useful case to think about in thinking about the social expectation problem here, because the very same kind of hypotheticals that some of which I've received today and the other side is raising about a neighbor or a friend coming back, those were the government's exact arguments in Hardeen's, that somebody can come to the front door and knock and ask if anybody's there, and so why can't a police officer do the same? And this Court was careful at page 1417 of that decision to say that's not the question. The question is whether a stranger can come onto the premises with trained dogs to explore the curtilage of somebody's house. And that's a very odd question to ask, I think, because very few strangers are going to do that. But that's the question this Court insisted on asking. And I think translated to this case, aversion, the same kind of question is what the Court has to do here, is ask a stranger, after being told, I invoke my rights, I want to keep what's inside private from you, I don't consent to any search. Whether a stranger coming back an hour later would think that when they ask the other tenant, can I come inside and search, that that tenant should give consent. Alitoson was based on an understanding of property rights, wasn't it? It was based on an understanding of property rights, Jardine's. I don't know that it was any more than Randolph. I mean, what the Court has said is that property rights inform the Fourth Amendment analysis. They don't utterly control it. But that the sanctity of the home is something the Fourth Amendment treats as special. And I think the property right that Mr. Fernandez had here was, which is undiminished by his arrest, and the other side hasn't disputed that it hasn't disputed this, is that he had a property right to keep the police out of his dwelling absent a warrant. And all we're asking is for that right to be preserved, at least so long as the police themselves render it impossible for him to enforce that right, literally impossible for him to enforce that right. The other side's theory, even taking away the police arrest, I think, if I understand it correctly, would require somebody to basically pitch a tent on their front steps in order to prevent the police from entering without a warrant. Kennedy, Jr.: Well, you say that the police prohibit him from exercising a right. There was an arraignment before a magistrate. The judicial system ordered him confined. Well, fair enough, Justice Kennedy. But at the time the search was made, it was only an hour later while the police had custody over him before any of that happened. Ginsburg. Is there any indication why the police didn't get a warrant in that hour interval? No. I don't think there's any testimony to that effect, Justice Ginsburg. And so what we're left with is the State's brief, which has primarily the administrative efficiency argument that Mr. Chief Justice has made. I understand in Maryland v. King this Court took that in consideration, but I think in numerous other Fourth Amendment cases the Court has said that's not enough. Roberts. It's not purely an admittance. The language I quoted said any number of reasons. One reason may be if the police leave and the woman is there, we're dealing with gang violence, that other members of the gang may come and say, you know, retrieve the contraband in the house. Going to get a warrant is not a sufficient answer in every case. There's a reason that the law has recognized the efficacy of consent in allowing the police to enter. Well, Mr. Chief Justice, in those other permutations, you have, first of all, the exigent circumstances doctrine. But even short of that, you have Illinois v. MacArthur, which allows the police to have everybody exit a dwelling and stabilize the situation until they can get a warrant. But you don't think there would be exigent circumstances in the case of this case, do you? No, I don't think so. I was just, in your hypothetical, there might have been if I understood it correctly, but. Breyer. That's the initial problem I started with. In this case, the policeman is standing at the door. She owns the house. She says, come in, come in. Maybe it's I'd just like to talk to you. Maybe I'd like to show you a few things. The 4-year-old says, the spouse hit her. That's why she's bleeding. She later says, oh, no, it wasn't the spouse. It was a woman named Veronica. Maybe that's all true here. But you could surely imagine cases where you had a little window of opportunity to find out what was going on in that house, which is hers. And now you say no, as long as the husband, who may have beaten her up six times, is now being held in jail lest he do it again. Policeman can't go in, even when she's willing to talk to them, even when she's willing to show them a few things we know not what. Now, perhaps I should just sweep that problem aside and say it isn't controlling. But that's what's worrying. No, Justice Breyer, I understand that's a concern, but there are two very easy ways for the police to deal with that. One is coolage. They can say, you can say, go get the things you're worried about and bring them to us, and the problem is solved. Alternatively, the police can say, thanks for telling us. I'm glad you did. I want to help you. Your husband has objected or your boyfriend has objected to us searching. Could you please step outside for 15 minutes? You and the little boy step outside for 15 minutes. We'll call a judge and get an official warrant, and we'll be inside in 15 minutes. Meanwhile, we'll protect you. I don't think that's too much to ask to preserve the privacy and the sanctity of the home. If the Court doesn't have any other questions, I think I'll stop here and reserve for rebuttal. Thank you, Mr. Fisher. Mr. Carlin. Mr. Chief Justice, and may it please the Court. A present co-tenant's consent to search is not nullified, must not be nullified or rendered invalid by an absent tenant's prior objection. Everyone knows that when they choose to live together and one person is absent, the other person has the authority. That person has the authority to admit visitors of her choice, to and certainly to consent to a search of a shared premises. Here, Ms. Rojas had the authority as the sole present tenant to call the shots, to admit visitors of her choice, and to consent to a search. Would that be so if Fernandez left, he's made known his objection, and then he says, I'm going to pick up something at the drugstore. The minute he leaves, can the police then say to his cohabitant, do you consent? If he says yes, police come in? Yes, Your Honor, it would. When a person leaves a residence, and this was the linchpin of Randolph, when a person leaves the residence, social expectations change. They change dramatically. You're not faced with the situation of pushing past someone who's saying, stay out. When someone leaves, I will think differently about my permission to come in. Regardless of what we do. Sotomayor So what's left of Randolph if we accept your rule? I mean, all the police have to do is arrest anyone if they have probable cause. And if they don't, all they have to do is remove them from the premises and just talk to the co-tenant, even though they've heard an objection. When is Randolph ever going to survive after this, assuming we accept your rule? Justice Sotomayor, Randolph remains efficacious for the narrow situation it was crafted to object, to address. A person says, stay out, you may not search, the police may not search. And that remains, in effect, under the formalistic rule of Randolph while that person remains in the premises. Now. Sotomayor So there's nothing left to Randolph. The police just remove the person. Justice Breyer Well, the police can't just remove a person. Sotomayor Into the police car, to the station. How far before Randolph dies? Well, certainly as in this case, where there's a valid arrest, that person is gone, that person is absent by any standard, and that's an objectively reasonable thing the police officers did. Can they just remove him? It would be a different case, probably, if they just removed him without probable cause. Breyer Smith goes up to the House, and Mrs. Jones and Mr. Jones, Mrs. Jones, please come in. Mr. Jones, stay out. Well, I mean, Randolph says, nope, most people wouldn't go in in those circumstances. So now Mrs. Jones says, tell Smith, my husband, rather, Smith, you tell my husband that there's a telephone call for him at the local pharmacy. And so he does. So now he's not there. And so now they can go in. I mean, that seems like more fantastic than people entering the House in the first case. And so there does seem to me to be a real problem here if you write Randolph and agree to it, as I did, that you're going to say, okay, the police can just get him out of the way for a little while, legitimately, get him out of the way, maybe there really was a phone call, and now they go in the House. I mean, I don't see how I could write that without saying I was wrong in Randolph, which I still think I was right. All right. So therefore, one thing here, what about saying that that stay-out-of-my-house is at least valid for a reasonable time thereafter? And an hour and a half is not a reasonable time thereafter, at least when the police got him out of the way. Well, the reason the hour-and-a-half rule, I think, would be wrong is that it would effectively rob the co-tenant of her authority over that space. When he's gone, she really is in charge, and that is the social expectation. That's Matlock. That's the underlying assumption in Matlock, that when we're gone, we assume the risk. Breyer. That's all true, but can you answer my straight-faced question, which is how can I do this with a straight face? Both come out one way in Randolph and say when the police get him out of the way, knowing about what he doesn't want, that's all different. Can you explain how I could do that with a straight face? I think there are two things here. One, your concurrence was very narrow, and it said when he was physically present and if circumstances changed, the results should change. The second reason is that this Court in Kentucky v. King gave a very good response to this scenario and said if there is a Fourth Amendment violation in the run-up to, there it was, the exigent circumstances search. So here in the run-up to the consent, the analysis is different. Here, of course, we have a legitimate arrest. The person is absent by any standard. Social expectations in this case would say someone wanted to give assistance to Ms. Rojas. Social expectations would say, I've just seen the objector, having abused her, being bullied, hauled away to jail, social – and now I want to help her. Social expectations would say he should help. And it doesn't matter if it's a stranger or a friend or the repairman to come in and look at the wall heating unit where the sawed-off shotgun was. Randolph didn't draw that distinction. Kagan, don't you find that a little bit odd? I mean, this social expectations analysis applied to a case in which a police officer has power that no person, no stranger has. The police officer has just put the man in handcuffs and taken him away. A stranger does not have that power. So it's a bit odd to say, well, social expectations say that the stranger can walk into the house, you know, having just carted the person away. He can't do that. The social expectation analysis in Randolph really wasn't intended to address that question. The social expectation was a sort of a tiebreaker. We know that under general law, co-tenant consent controls. It's valid per se. But what do we do when someone is saying stay out? So the reason for using the social expectation question was to say what would a caller do, what would a visitor do confronted with that? And the question it was answering was would the person feel okay to enter? It didn't answer the second question of what happens after. What happens after had already been answered by this Court in Matlock when it said the whole basis for the co-tenant consent is that it's shared authority. So once you're in the end. Sotomayor, there was no objecting defendant. Correct. It's the presumption that still survived, that absent an objection, you have a consent. You assume whoever has control over the premises has consented. That's a different situation. Matlock doesn't control here. What controls in Matlock is the underlying reasoning that it's no longer a question of agency, and that really is the theory of Petitioner. Matlock rejected the notion of agency. What it said was in determining co-tenant consent, each co-tenant exercises his or her own rights on her own or his own. So when one is gone, it is that person's own right. It's not a question of what would this person do on behalf of the absent tenant. It is what this person would do on his or her own behalf. Kagan. You see, I thought that Randolph rejected that analysis. I thought that Randolph said, and you can agree with it or disagree with it, but it said, and I'm quoting here, So when you have an objection, Randolph says, the objection trumps, and the fact that there is a cooperative occupant there, well, again, I'm just quoting, it adds nothing. But, Your Honor, in this case, there is a co-operative occupant, and the co-operative occupant, when the objection was made, the police weren't searching. When the police went to search, there was only one occupant there. Mr. Fernandez was long gone, and the whole premise of Randolph is that you have a present person saying, come in, and you have a present person staying out. Yes, the lead opinion in Randolph said they cancel each other out. But we don't have that here. When there is only one person at the door, there is no Randolph dilemma. There's no dilemma. Kagan. Kagan. I guess this goes back to my other question. I find it impossible to get my head around this case without recognizing that we don't have it here because the police have taken the objector away. And so the police themselves have, you know, properly exercised a power that is the reason we don't continue to have the situation that Randolph concerned. Right. But the police action at every step in this case was not merely reasonable, but really exemplary. And when that statement was made, stay out, it was completely unenforceable. So the question is whether that prior statement somehow continues forward to bar, essentially, to hold Ms. Rojas hostage to this prior objection. He's no longer there. He never had any legitimate expectation that in his absence he could enforce this edict. So I think the President's absence dichotomy is really critical. And oh, the concern was raised that, well, we're saying you've got to camp out on the lawn in order to enforce this. We're not saying that. A Randolph objection is valid when it's made, and it's valid and it continues to remain valid while you're on the premises. Now, is there nothing you can do? There are things you can do. You can create, for lack of a better word, a non-shared space. So you can have a locked box. You can have a closet to which only you have access. You can have a locked office to which only you have access. So there are things you can do. Of course, you could also choose to live alone. You could choose to live with someone who would enforce your rights. These are all things that are open to a co-tenant. Kagan. You don't disagree, do you, Mr. Carlin? And I don't want to put words in your mouth, but you don't disagree that the expectation of privacy does not decline after the arrest is made? In other words, that Mr. Fernandez's expectation of privacy remains the same? I do not disagree. I think that's Chimmel or Schimel, and that established that. The question is not his expectation of privacy. The question is whether his — in his absence, this prior statement can trump the authorized tenant who's in charge. Sotomayor I'm a little confused. I thought that when a co-tenant gave permission to search, that gave permission to open anything in the premises, to search the entire premises. You're talking about a locked closet or a locked box? Why would it be? Your Honor, in Rodriguez and in this, the question is apparent authority to give consent to shared spaces. So you — the police can only enter and search spaces that are shared. They cannot go into spaces where the co-tenant does not have apparent authority to grant belief. So if that's a place she doesn't have access to, no, you know, this is mine, stay out, here's, you know, a lock, a padlock on it. It would be probably unreasonable for the police to say, you know, we think you have authority to grant us consent to look in that box. I own the house. Yes. I'm letting the person use it by sufferance, not by — but it's still my closet. If it's a locked — we can have a variety of living arrangements, and there can certainly be within a home a space that is purely yours. Sotomayor, I would certainly recommend to every married couple now to have a prenuptial agreement on access rights. But I do think that you can create spaces that, from all reasonable appearances, are yours. Breyer. I don't think there's — reading your brief and the other, I don't think this is a case where she wanted to talk to the police, is it? The policeman says he wants to get in there because he's afraid a child has been holding — being held hostage. And why wouldn't that give him grounds for — was it an exigency? I mean, why wouldn't he get in on other grounds there that, exigent circumstances, the child might be held hostage? Isn't that a good ground for going in immediately with a warrant? In this case, that's exactly what they did. And no one's contesting that. They say they could do that. So the problem is when they came back. Yes. Okay. When they came back, what she says, apparently, or what they give the impression, as I read it quickly, that it isn't a case where when they came back, she wanted particularly to give evidence to the police. No. The police said, we've arrested Petitioner and now we want to conduct a search for evidence. So — but looking at this pragmatically, realistically, why wouldn't she want to hand over the shotgun directly, assuming she could get it out, assuming she wanted to handle it? Well, she's living at the epicenter of gang territory with an abusive boyfriend. She — certainly the power is there under Coolidge, that authority is there, but, realistically, wouldn't she want to say — to avoid directly handing over the — the instruments of criminality? It seems to me quite a reasonable thing to do, to say, it's okay to search, but I don't want to be handing you directly the evidence. Kagan. Mr. Carlin, there is, in this case, some indication that she was not inviting this search, that the — she in the end consented, but only after the police suggested that her child could be taken away. And, you know, the facts of this case are not, I'm standing at the door dying for you to come in. Well, with regard to the voluntariness, that was established as a matter of fact and is not being challenged. This search was voluntary and has been held at. Now, at the suppression hearing, when Officer Cerrito testified on rebuttal, he said, no, he — we never threatened that, and his testimony really makes a lot of sense, because they never began the domestic abuse investigation until after they had come back upstairs and gotten consent. And what he said was, once they found the sawed-off shotgun, they had to alert Child Services. So the Court found that this — that Ms. Rojas' consent was not coerced, and it implicitly rejected those allegations. To conclude, the judgment of the California Court of Appeals should be affirmed. Ms. Rojas, as a sole present tenant, was entitled to give the police consent to search the shared residence. Her authority to decide what's best for herself and her family should not be held hostage to an absent tenant's objection. Thank you, counsel. Mr. Palmore. Thank you, Mr. Chief Justice, and may it please the Court. An individual's consent to admit visitors into her own home may not be prospectively negated by the earlier objection of an absent tenant. Each co-occupant assumes the risk that the other will admit visitors not to his liking, and this Court has adopted a mirroring rule of Fourth Amendment consent. We read Georgia v. Randolph as establishing a narrow exception to that rule in a situation in which the two co-occupants are standing in the doorway, disputing and disagreeing on whether to admit the visitors. Ginsburg. Then you could reduce Randolph to nothingness by saying the police, as long as the co-occupant has the authority to get the objector out, then they can override any subjection that doesn't count. Justice Ginsburg, Randolph was a self-consciously narrowly written and explained decision. On its own terms, it is narrow, and we read it as establishing a narrow, circumstance-specific exception to the general rule in this area. The general rule in this area is articulated by the Court in Matlock, and it's the  When you live with another, you assume the risk that they will admit visitors not to your liking. And Randolph puts a gloss on that rule, which says when you live with another, you put you assume the risk of your inability to control access to the premises when you are not there. When you're there, the two occupants are standing in the doorway, disagreeing on whether to admit the visitor. What Randolph said was the tie goes to the objector. When the objector is absent, there is no tie, and the normal rule applies. The normal rule is that each occupant has the authority in her own right to admit visitors to her own home. Mr. Fisher's presentation began with his articulation of a view that the — that this area of co-occupant consent is based on agency principles, that the reason in a Matlock situation that we allow the present tenant to consent and we didn't ask the potentially objecting defendant who was sitting in the squad car at the curb is because we can assume that she speaks for him. But that's not what Matlock said. Matlock said she has the authority to give consent in her own right. She lives there, too, and she can decide whom to admit to her home. Justice Kennedy, you highlighted the issue that under Petitioner's view, there is in a sense a continuing objection, and it's entirely unclear when it ends. In this case, the defendant was in custody, he was arrested on probable cause, and he was in custody through the duration, through the trial. And it — the standard on the other side is completely unmanageable, because unless the consent is going to be viewed as perpetual, that it kind of hovers like a phantom of what the court says. Sotomayor, why did they need to search? I mean, to look around the house, yes, but if this is a search only for purposes of domestic violence, what in her story made them think there was evidence anywhere that was locked up, that had been — that there had been any time to lock it up or dispose of it? Justice Sotomayor, in this case, this was just a pure, we want to find something else. Well, he had been identified as the robber. So recall the fact there was a robbery. They go — in fact, I think Mr. Carlin was correct. There was really kind of exemplary police work at every step in this case. These officers were in the gang intelligence unit. They went to this alleyway because they knew that that's a likely place that the gang member was found. So they were looking for evidence not on the ground that they arrested him on, but on an independent crime. Well, there are two — the sequence is important. They're in the alley because they think there may be a connection to the robbery. Then they hear screaming from the apartment and fighting. Then they think they have a domestic violence situation, which they do. They go to the door. They — she answers the door, bloodied and bruised. They take him out to separate the two and to figure out what's going on in the domestic violence situation. As they're taking him out, they recognize the tattoo that he matches the description of the robbery suspect, and then there's a show-off identification. At that point, it becomes both a robbery investigation and a domestic violence investigation, and he's put under arrest. Sotomayor, did they have a probable cause and then a warrant? Pardon me? Once he was identified, did they have probable cause to get a warrant? I think they almost certainly did have probable cause to get a warrant at that — at that point. But the Chief Justice is quite correct that in Kentucky v. King, this Court made clear that the possibility that the police could have pursued an alternative means of obtaining evidence. So we have everything here, the things that — the everything. The search at issue was a search solely for evidence? Yes. Yes. Okay. And the Chief Justice made his objection known clearly and directly to the officers seeking to enter the house? Yes. A little earlier, but he did. The officers did not justify their search on grounds of possible evidence destruction, and as far as the record reveals, the officers might easily have secured the premises and sought a warrant permitting them to enter. So all these factors are there. And the other offsetting factors that the officer, the invitation, could reflect the victim's fear about left alone with an abuser, no. Because the abuser is not there. It could also indicate the availability of evidence in the form of a willingness to speak that might not otherwise exist, as far as we know that isn't present. Therefore, it fits totally within Randolph, but for one thing. The police themselves took him away. Now, I mean, it's not a — it's not really a subterfuge, but it might look like that you've just eroded Randolph for no reason. You get around your point by saying at least that known consent, I mean, known objection, has enough force to last for a reasonable time, which isn't the best way of writing perhaps a Fourth Amendment opinion, but it does have the — leaves it up to the lower courts to figure out what is, and it maintains some life in Randolph. Okay. That's a fairly long question, but you see where I'm going. And your answer is what? Your Honor, I don't think a reasonable time requirement like that is readily administrable. It doesn't provide a clear answer to officers in the field on what their rights are to — to — Sotomayor, how about a clear answer, get him a warrant? Your Honor, that's just inconsistent with Kentucky v. King and — Get a — when you have probable cause to believe a crime has been committed and here clearly you admit there would have been probable cause to search, there's no exigency, there's no looking for evidence related to the crime that drew you particularly there, the screaming, that you just got to secure the premises and get a warrant. I don't know why that's so difficult for police officers to understand. Your first obligation under the Fourth Amendment is get a warrant. Justice Sotomayor, this Court has not adopted that kind of less restrictive means analysis in this area. And again, Kentucky v. King is — is clear on this point, that the reasonableness of police actions has to be judged based on those actions themselves. And if they're reasonable on their face, they're not rendered unreasonable because the officers could have obtained a warrant or could have obtained the evidence in some other way. And in the case like this, and it's also important to note that consent is not a disfavored doctrine that needs to be confined to narrow categories. This Court had said, going back to Schnecklock v. Bustamante, that consent is actually favored, that we want people to cooperate with law enforcement. Kagan. Mr. Palmore, could I ask what you think that this sentence means in Randolph? There's a statement that says so long as there is no evidence that the police have removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection, what do you think that means? When do you think it would apply? Palmore, Your Honor, that was, of course, Dicta and Randolph, because there was no that wasn't presented, and it isn't presented here either, because there's no such allegation. We actually agree, I think perhaps all of us at these tables agree, that to the extent there is any inquiry like that, it has to be an objective inquiry. So we read that as alluding to a possibility that if the officers arrested someone without probable cause or took some other step that was objectively unreasonable under the Fourth Amendment, that that might raise an issue. So it would only apply if the taking the person away from the home was unreasonable. But as long as that was lawful, whether you did it by saying, you know, come walk around the block with me, or whether you actually had probable cause to arrest and you took him to the station house, either way, that this language would not apply. We don't think that language would apply. We think that language has to be read in light of the entire corpus of this Court's Fourth Amendment jurisprudence, which has consistently rejected such subjective tests and looked only to the objective reasonableness of officers' actions. Kagan. And has anybody ever found that conduct fit within that language? Has any court ever used that language in any way to state that this, you know, this goes beyond the bounds? I haven't found any such case. I did look, and there are plenty of defendants that make that argument. I haven't found one where it succeeded. And often the courts, as part of their analysis, say, no, the removal wasn't done for that purpose. It was done because there was probable cause to believe that you committed a crime. So they fall back on the normal rule, which is the objective test of the reasonableness of the actions. Kennedy. I think the property law cases that you cite, pages 24, 25 of your brief, I had thought originally that this would be the principal focus of our decisions in these cases, but it's marginally in your favor. It's not really very strong. I mean, you have an 1839 North Carolina case and a CJS case. There's just not a lot of help in property law. You're right, Justice Kennedy. I don't think that property law crisply presents this kind of disputed consent issue, though it is clear under property law that co-tenants have full access to the property and they may license entry to the same extent that they have access and that the visitor steps into their shoes, and it would not be liable for trespass. Thank you, counsel. Mr. Fisher, you have 6 minutes left. Thank you. I think I'd like to use as my jumping-off point Justice Breyer's last question where he went through, I believe, the elements in his concurrence. They're all present in this case. And as to the test, the reasonableness test, if you have any qualms about that being a test, you can do the case even more narrowly and it would take care, again, of the vast majority of cases that have arisen post Randolph and simply say the objection has to be valid so long as it's impossible for him to enforce it. So long as it's impossible for him to be physically present in enforcing it through no voluntary action of his own, at least then the objection has to be valid. In the lockbox example, the other side gives, even that isn't available to Mr. Fernandez. Once he objected and knew the police were interested in his dwelling, he didn't have an opportunity even to do that. If he had private papers, remember, we have to think of all different kinds of cases that might arise for where the police are seeking consent. He couldn't even take that step. Kennedy, because if he's a law-abiding citizen, the police couldn't take him away  him to another place. So the co-tenant has much less authority to allow people to enter if her other co-tenant is a criminal than if he's a law-abiding citizen. That's the result. No, because the reason that's the best, that's the result of the way you allocate the rights and duties of the co-tenant who allows the person to enter. No, Justice Kennedy, because if he's a law-abiding citizen, the police couldn't take him away and he could stay there. Or at a minimum, the police might be able to reposition him, as I think they've acknowledged, in a probe or a lockbox. No, the law-abiding citizen says I'm going away for 3 days, don't let anybody in the house, but the co-tenant can overcome that, but not in the case of the law. Well, I'm interrupting your rebuttal. No, but to be intellectually coherent, you might say, no, even then the police couldn't override it. I don't think there's any reason to believe that the police could then think, if somebody said I object to you entering the dwelling and doing a general search, now, I have a business trip next week for 3 days, I want you to let me know I still object and do not want any warrantless general searches of my home, I think there the police would have a hard time arguing that they had valid third party consent from the person. Breyer, the problem, as long as he can't enforce it, he's the worst criminal in the world, right from the house to 20 years in Sing Sing. So she can't, right, let anyone in the house of the police department for 20 years. That can't be right. No, because I think once he's imprisoned, you might say he has a new domicile, Justice Breyer. I think he's lost ownership control over that house. But I think what this case reduces to, Justice Kennedy, to get back to your question, is really what respect is owed this Court's Randolph decision. I think the questions have adequately pointed out that if you adopt the other side's position on the facts of this case where the police forcibly remove somebody to the dwelling, Randolph reduces to nothing, literally nothing. It's also about what respect is owed to somebody invoking somebody's constitutional rights. In another case last term, this plurality of this Court went to lengths to explain how important it is that people invoke their constitutional rights, and presumably when they do, the police need to respect it. We live in a constitutional system that deals with individual dignity, not just of homeowners, but of people who raise their rights, and they need to be respected. Now, you have left these practical — you know, if there were insuperable practical problems to enforcing Randolph in this setting, maybe you would want to reduce it to nothing and effectively overrule it. But I don't think there's any good reason to do that, because I think you have a very easy rule that will resolve almost all the cases that I've offered you, and it will deal with — by exigent circumstances doctrine, by the warrant, ease of getting a warrant, by Illinois v. MacArthur, which lets the police bring somebody outside. All of those things can very easily deal, I think, with the concerns that the Court has put forward. Robertson, I don't understand how you can say it would render Randolph a dead letter. The Randolph was expressly limited to physical presence. It expressly acknowledged that it was formalistic. And even the concurring opinion said, quote, ''The Court's opinion does not apply where the objector is not present and objecting.'' So what you're really arguing for is an extension of Randolph, not an undermining of it. Fisherman, No, I think when Randolph said it was being formalistic, it didn't mean we're establishing a meaningless right. And so, yes, the facts of that case were somebody who's physically present. The facts of this case begin with somebody who's physically present. And I think this Court ought to treat its opinion as having some genuine meaning in the real world. Alito, why does your rule express profound disrespect for the co-tenant who is standing at the door and who has — who says, I've just been beaten up by my co-tenant, and I want you to come into my house and see the evidence of what my co-tenant has done to me. And you say to that co-tenant who's standing by the door, you do not have the right to invite the police into your house to look for evidence of what was done to you. Fisherman, Well, two things, Justice Alito. First, that's not the facts of this case. Remember, they come back earlier solely looking for evidence of what happened. Alito, but it would apply in that case, would it not? Fisherman, It would. And there I think it is not too much disrespectful to say to her, I'd like to help you, we will help you. Your boyfriend has objected, let us just get a warrant and we'll be right with you and we'll help you. I don't think that's too disrespectful. It respects her rights and the constitutional system under which we live. Roberts. Thank you, counsel. The case is submitted.